UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                      PLAINTIFF

v.                                      CRIMINAL ACTION NO. 3:09-CR-28-R

LE'ANGELO D. SULLIVAN                                         DEFENDANT

**FINDINGS OF FACT
CONCLUSIONS OF LAW
<u>AND RECOMMENDATION</u>**

This matter is before the Court to consider the motion of Le'Angelo Sullivan to suppress evidence obtained by the Louisville Police on April 8, 2008, during a warrantless search of his person and automobile that occurred at the time of his arrest for operating a vehicle without a operator's license.  Based on evidence then seized, a federal grand jury indicted Sullivan on charges of possession with intent to distribute 50 grams or more of crack cocaine, possession with intent to distribute cocaine, and possession of a firearm by a convicted felon.

Sullivan now maintains that the warrantless seizure of the drugs and firearm by the police violated the search incident to arrest standard recently established by *Arizona v. Gant*, 556 U.S. __ ,129 S. Ct. 1710 (2009). He also challenges the notion that the two officers at the scene had probable cause to search his automobile without a warrant pursuant the automobile exception to the warrant requirement of the Fourth Amendment.  The United States argues in response that both the warrantless search of Sullivan's person and that of his automobile were constitutional under the above exceptions to the warrant requirement.  Based on its own review of the suppression hearing testimony and cited case law, the Magistrate Judge concludes that Sullivan's motion to suppress should be denied.

## FINDINGS OF FACT

The events that resulted in the prosecution of Le'Angelo Sullivan began at approximately 5 p.m. on April 8, 2008.  On that date, Louisville Metro Police Department (LMPD) detectives James Kaufling and David Haight[1] were on duty near the second division LMPD substation when they received a radio dispatch.  (DN 26, Transcript of Suppression Hearing, p. 12).  The police dispatcher reported only that a man in the 1600 block of Dixie Hwy. was shooting a gun in the alley behind Martin's Tavern.  (*Id*.).  No other information was provided in this first dispatch.

Detectives Haight and Kaufling immediately set out from the substation driving together to the scene of the shooting.  (DN 26, p. 13).  Det. Kaufling testified that the officers' vehicle arrived on the scene in the alley behind the tavern within three-to-five minutes of receiving the dispatch, which Det. Kaufling conceded was not very detailed.  (*Id*. at 13-14).  The officers drove through the back alley and circled the block.  As they returned to the alley, they received a second LMPD radio dispatch advising them that the man with the gun was in a white Cadillac.  (*Id*. at 15).  No other information was provided such as the license plate of the vehicle, a description of the man therein,  the nature of the shooting, or any other background information.  (DN 26, p. 33-34, 36).  As Det. Kaufling described the second radio dispatch, "It was very vague."

On their second drive through the alleyway, immediately after they received this second dispatch, Dets. Kaufling and Haight saw a white Cadillac in the public alley as it pulled

---

[1]  The transcript misidentifies the witness as James "Cofling."  The correct spelling of the witness's surname is "Kaufling."  The transcript also incorrectly identifies the detective's partner as being David "Hay."  The correct name of Det. Kaufling's partner is Det. David Haight.

into the backyard driveway of a residence located at 1815 W. Lee.  (DN 26, p. 15, 18).  As the detectives watched, Sullivan exited the car and began walking purposefully toward the home. (*Id*. at 20-21).  Dets. Kaufling and Haight exited their vehicle and approached Sullivan in the backyard of his home to ask him about the shooting incident.  (*Id*. at 19).  At this point, Sullivan was located approximately 10 feet from the parked Cadillac.  (*Id*. at 20).  Det. Kaufling saw no other individual in the Cadillac.  (*Id.).*

When asked about the shooting or whether he had been driving the white Cadillac, Sullivan denied that he had been driving the Cadillac or that he had been involved in shooting a firearm.  According to Det. Kaufling, Sullivan appeared to be "a little nervous, kind of fidgety."  (*Id*. at 21).  Sullivan had the keys to the Cadillac in his hand.  (*Id*. at 28).  Det. Kaufling then asked Sullivan to produce his operator's license.  Sullivan advised the officers that he did not have an operator's license.[2]  (*Id*. at 22).  At that point, the detectives arrested Sullivan for driving without an operator's license.  (*Id*.).  Sullivan was placed in handcuffs.  Det. Haight held onto the handcuffs as Sullivan stood there in his backyard.  At that point, the detectives had not yet searched Sullivan's person or his vehicle.  (*Id*.).

Det. Kaufling then used the car keys obtained from Sullivan to open the Cadillac. On the floorboard of the passenger side he saw a shoe box.  (*Id*. at 23).  Det. Kaufling entered the car and opened the shoe box.  Inside the shoe box he saw two plastic bags of what appeared to

---

[2]  Det. Kaufling initially testified that Sullivan told him that he did not have an operator's license on his person.  After refreshing his recollection by looking at his investigative memorandum, the detective testified that Sullivan had said he did not have an operator's license. Det. Kaufling was not sure whether Sullivan produced a Ky. learner's permit at that time or whether they found the learner's permit while searching Sullivan's person following his arrest. (*Id*. at 38, 41, 43).

him to be crack cocaine.  (*Id*.).  No other items were in the shoe box at that point.[3]  Upon the

discovery of the shoe box, Det. Kaufling advised Sullivan of his *Miranda* rights.  (*Id*. at 26).

Sullivan acknowledged that he understood his rights and appeared to Det. Kaufling to understand

them.  (*Id*. at 26-27).  Det. Kaufling then attempted to ask Sullivan several questions; however,

Sullivan was unresponsive in most instances.  (*Id*. at 27).  When Det. Kaufling asked him if there

was a weapon in the Cadillac, Sullivan responded, "No."  (*Id*.).  Det. Haight then opened the

trunk of the Cadillac with Sullivan's car keys.  (*Id*. at 28).

Upon opening the trunk, Det. Haight observed a 40 caliber Glock semi-automatic

handgun lying deep inside the trunk on top of a speaker box.  (*Id*. at 28-29).  After the discovery

of the handgun, the detectives conducted a search of Sullivan's person.  (*Id*. at 31).  Det.

Kaufling discovered additional crack cocaine in Sullivan's left front pants pocket.  (*Id*. at 32).  In

his right back pocket was an electronic digital scale.  (*Id*.).  His right front pocket held $3,055 in

cash.  (*Id*.).

Throughout the entire sequence of events, members of Sullivan's family were

milling about in the immediately area watching events unfold from the back porch of the home.

(*Id*. at 30-31).   Additional beat officers of the LMPD also were on the scene.  (*Id*.).  After the

Glock handgun was discovered, an Alcohol Tobacco and Firearms (ATF) agent was summoned

to work the scene as well.

At no time during any of these events did Det. Kaufling or Det. Haight attempt to

obtain a search warrant.  The incident report and the investigative memo prepared by Det.

---

[3] Later in the ensuing investigation at the scene, the detectives took cash and drug-related property seized from Sullivan's person and temporarily placed it in the shoe box.  All of those items are shown in the photograph introduced as Gov. Ex. 2 and 3.  (DN 26, p. 24).

Kaufling both indicated that Sullivan and the Cadillac were searched incident to arrest.  Not until the filing of the motion to suppress did the Government maintain that it relied upon the automobile exception to the warrant requirement as a basis for the search of Sullivan's Cadillac on April 8, 2008.

## CONCLUSIONS OF LAW

**a.     Warrantless Entry onto the Property to Confront Sullivan.**

The first Fourth Amendment question that the Court must address arises from the warrantless entry of Dets. Kaufling and Haight onto the private property at 1815 W. Lee immediately after Sullivan was seen exiting from the white Cadillac automobile after he pulled from the public alley onto the rear driveway of the property.  Det. Kaufling testified that the property at 1815 W. Lee abutted an alleyway that ran east to west forming a "T" intersection with the alleyway that ran north-south behind Martin's Tavern.  (DN 26, p. 19).  On seeing the vehicle drive onto the property, Dets. Kaufling and Haight exited their own vehicle and walked into the backyard at 1815 W. Lee where they stopped Sullivan as he was walking away from the Cadillac approximately ten feet behind him.  (*Id*. at 19-20).

The record is undisputed that the detectives had no warrant or other court order to permit them entry onto the property at 1815 W. Lee.  During the suppression hearing, Sullivan repeatedly stressed that he was stopped while outside the Cadillac on his own property.  Accordingly, the first matter to be resolved is whether the officers had a lawful right to enter the residential property and stop Sullivan to question him concerning the shooting incident just reported by the police dispatcher.

5

The Fourth Amendment provides a fundamental guarantee that individuals shall be free from warrantless unreasonable searches and seizures in their "persons, houses, papers and effects." U.S. Const. Amend. IV. This protection afforded by the Fourth Amendment includes not only one's home, but the land surrounding and associated with the home, which "harbors the intimate activities associated with the sanctity of a man's home and the privacies of life." *United States v. Dunn*, 480 U.S. 294, 300 (1987). The Supreme Court therefore has extended the protections of the Fourth Amendment to what is known as the "curtilage" surrounding the home. *Oliver v. United States*, 466 U.S. 170, 180 (1984).

*Dunn* established four factors to be considered when determining whether a specific area falls within the curtilage. *Dunn*, 480 U.S. at 301. These factors include: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id*. Once it is determined that a specific area satisfies the test established by *Dunn*, then the protections of the Fourth Amendment will apply, although the U.S. Supreme Court has yet to finally put to rest the "degree of Fourth Amendment protection afforded the curtilage." *Oliver*, 466 U.S. at 180.

A review of applicable federal case law reveals that the curtilage of a home is not sacrosanct in the sense that officers are constitutionally prohibited in all cases from entering thereon without a warrant when they are engaged in a criminal investigation. A number of federal circuits permit law enforcement officers to enter the curtilage of a home in order to voluntarily interview individuals in furtherance of a legitimate law enforcement objective. *See Estate of Smith v. Marlasco*, 430 F.3d 140, 158 (3rd Cir. 2005) (Officers who reasonably believed

6

based on facts available to them that the person they seek to interview may be located on a particular property within the curtilage may briefly enter into the curtilage without a warrant to test whether such belief is justified.); *United States v. Weston*, 443 F.3d 661, 667 (8th Cir. 2006) (Warrantless entry onto the curtilage of a home is permissible so long as a legitimate law enforcement objective exists and the intrusion upon the owner's privacy is limited); *United States v. Hammett*, 236 F.3d 1054, 1059 (9th Cir. 2001) ("Officers may encroach upon the curtilage of a home for the purpose of asking questions of the occupants."); *United States v. Taylor*, 458 F.3d 1201, 1205 (11th Cir. 2006) (The Government need not demonstrate probable cause nor exigent circumstances in order to make an otherwise lawful intrusion onto private property.).

    Our own circuit has recognized the same right of police officers to encroach upon the curtilage for the purpose of furthering the well-known "knock and talk" investigative technique previously recognized in the Sixth Circuit.  *See Hardesty v. Hamburg Twp.* 461 F.3d 646, 654 (6th Cir. 2006) ("We adopt an approach similar to those taken by our sister circuits and hold that the officers' decision to proceed around the house to seek out a backdoor was within the scope of the knock and talk investigative technique already recognized in this circuit.  Police officers are permitted to enter private property and approach the front door in order to ask questions or ask for consent to search the premises.").

    The backyard was located immediately adjacent to the rear of the home and was the place of family activity as evidenced by the fact that Sullivan's own family had come out into the backyard and was standing on the deck watching as events unfolded.  Further, Sullivan apparently was not far from the home when he was stopped walking toward it.  All of these

factors and the case law in this circuit applying the *Dunn* factors confirm that the backyard of 1815 W. Lee was within the curtilage of the home.  *See Young v. City of Radcliff*, 516 F. Supp.2d 767, 784-85 (W.D. Ky. 2008) (Suspects who were standing approximately 15-to-20 feet from the backdoor of the home were within the curtilage of the home.).  *See also, Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 601 (6th Cir. 1988) ("The backyard and area immediately surrounding the home are really extensions of the dwelling itself.").

This conclusion, however, does not make the entry of Dets. Kaufling and Haight onto the property *per se* a violation of the Fourth Amendment.  As the *Hardesty* decision reveals, the Sixth Circuit will permit law enforcement officers to enter onto the property of a suspect without a warrant when they are there for the purpose of conducting an otherwise lawful investigative inquiry such as that of the detectives in the present case.  Accordingly, their mere entry into the backyard at 1815 W. Lee worked no Fourth Amendment violation of itself.

**b.      Terry Stop.**

The second Fourth Amendment question for review centers on the detectives' stop of Sullivan in order to question him concerning the shooting incident.  There is no dispute that the detectives stopped Sullivan from continuing to walk toward the house; therefore, the situation was not one where an individual is approached in a public place by the police and asked merely if he will answer a few questions. *See Illinois v. Lidster*, 540 U.S. 419, 425 (2004) ("Law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen.") (citing *Florida v. Royer*, 460

8

U.S. 491, 497 (1983)).  *See also, United States v. Foster*, 376 F.3d 577, 584 (6th Cir. 2004), *cert. denied*, 543 U.S. 1012 (2004).  Here, Sullivan was stopped in his tracks by the police, and the record gives no indication that he would have been free simply to continue walking and refuse to answer their requests.  Accordingly, a *Terry* analysis is required.

Under the <u>Terry</u> doctrine, law enforcement officers may make a warrantless stop of a person or an automobile "where a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity." *United States v. Hurst*, 228 F.3d 751, 756-57 (6th Cir. 2000); *United States v. Sandridge*, 385 F.3d 1032 (6th Cir. 2004) ("When a police officer conducts a brief investigatory stop of a person in a vehicle, 'the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot.'") (quoting *United States v. Arvizu*, 534 U.S. 226, 273 (2002)).

Reasonable suspicion is determined by the totality of the circumstances.  *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001).  The critical question is whether the officer's involved had a particularized and objective basis for suspecting criminal wrongdoing.  *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.").  Officers in making such investigatory stops are permitted to draw upon their professional experience and specialized training to make inferences from and deductions about the facts available to them that might not seem significant to an untrained individual.  *Id*. at 418.

While the likelihood of criminal activity need not rise to the level required to establish probable cause, or even to establish a preponderance of the evidence, the officers may

not conduct an investigative detention based merely upon an unarticulated "hunch." *Terry*, 392 U.S. at 27.  The concept of reasonable suspicion is incapable of being reduced to a neat set of rules.  Even factors which might independently seem innocent of themselves, when taken as a whole, may give rise to reasonable suspicion.  *See, Ornelas v. United States*, 517 U.S. 690, 695-696, 699 (1996).  *See, Alabama v. White*, 496 U.S. 325 (1990) (discussing the level of suspicion required for a *Terry* stop).  Further, the collective knowledge of all the law enforcement officers involved in the stop may be taken into consideration when determining whether reasonable suspicion exists.  *See, United States v. Miramontde*, 365 F.3d 901, 905 (10th Cir. 2004) ("Probable cause and/or reasonable suspicion can rest on the collective knowledge of law enforcement, rather than solely on that of the arresting officer.").

The facts available to Dets. Kaufling and Haight readily satisfied the *Terry* standard.  The officers at the time of the stop had specific facts that created at a bare minimum a reasonable suspicion to believe that Sullivan had been involved in criminal activity.  First, the officers had received two radio dispatches which provided information that an individual in a white Cadillac in the 1600 block of Dixie Hwy. was firing a firearm within the city limits.[4]  The officers arrived at the scene within three-to-five minutes of the initial radio dispatch.  Within mere seconds of receiving the second radio dispatch as they drove in the alleyway behind Martin's Tavern, they saw a white Cadillac, the very type of vehicle mentioned in the radio dispatch, proceeding across the alleyway and pulling into 1815 W. Lee.  The close proximity in

---

[4]  This information, while limited, reasonably raised the possibility of a number of potentially serious criminal offenses such as wanton endangerment in the first or second degree. *See* KRS 508.060 and 508.070 (Michie 2008).  *See, Key v. Commonwealth*, 840 S.W.2d 827 (Ky. App. 1992).

both time and location, as well as the matching description of the vehicle, certainly would create a reasonable suspicion that the driver of the white Cadillac might have been involved in the shooting incident reported by the dispatcher.  Therefore, a brief, warrantless investigative stop under *Terry* by Dets. Kaufling and Haight was entirely lawful.

**c.     Probable Cause to Arrest.**

During the *Terry* stop of Sullivan, Det. Kaufling asked Sullivan whether he had been driving the Cadillac.  The officers had just witnessed Sullivan drive the Cadillac from the alley onto the driveway in the backyard of the residence.  They also had seen Sullivan exit the vehicle and begin to walk toward the home.  He had the keys to the vehicle in his hand.  Nevertheless, when asked, Sullivan nervously denied that he had been driving the automobile, a statement that both officers knew to be untrue.

Det. Kaufling then asked Sullivan to produce his operator's license.  Under Kentucky law, it is a misdemeanor offense for an individual to drive an automobile in Kentucky without an operator's license.  A driver is required by law to produce his license on the demand of a police officer.[5]  Sullivan did not have a driver's license, but he did have a learner's permit.

---

[5]  *See* KRS 186.620 ("No person who has not applied for an operator's license or whose operator's license has been denied, canceled, suspended or revoked, or whose privilege to operate a motor vehicle has been withdrawn, shall operate any motor vehicle on the highway while the license is denied, canceled, suspended or revoked, or his privilege to operate a motor vehicle is withdrawn, or the license has not been applied for.").  Kentucky statutes further provide that a licensee in Kentucky "shall have his license in his immediate possession at all times when driving a motor vehicle, and shall display it upon demand to ... a peace officer...." KRS 186.510 (Michie 1997).  Under the penalty section of KRS 186.990(3), a person who violates any of the provisions of KRS 186.400 to KRS 186.640 shall be guilty of a class B misdemeanor.  KRS 186.990(3) (Michie 1997).

Det. Kaufling could not recall if Sullivan said he did not have a driver's license or produced his learner's permit in response to Kaufling's request to see Sullivan's license.  It is possible that Kaufling did not find the learner's permit until Sullivan was arrested, handcuffed, and his person searched.  Kentucky law does permit an individual who has a valid learner's permit in his possession to operate a motor vehicle upon the highways; however, to do so without a licensed driver in the vehicle is classified as a violation under KRS 186.450.[6]

Whether Sullivan responded to Det. Kaufling's request for his operator's license by saying he did not have one or by producing his learner's permit (rather than Kaufling discovering the permit after Sullivan's arrest) is immaterial to the Court's legal analysis.  Under either scenario, the officers observed Sullivan operate a motor vehicle in violation of Kentucky motor vehicle laws.  While it is true that Kentucky law restricts a police officer's authority to arrest for misdemeanors to only those committed in the officer's presence and provides no authority to arrest for offenses classified as violations, those restrictions have no bearing on the Court's findings.[7]

---

[6] *See* KRS 186.450(4) (Michie 1997).  The individual, however, "when operating a motor vehicle ... shall be accompanied by a person with a valid operator's license who is at least twenty-one (21) years of age occupying the seat beside the operator at all times." *Id*.  The violation of this provision of KRS 186.450(4) is deemed by operation of KRS 186.990(3) to be merely a violation, rather than a misdemeanor.  See KRS 186.990(3) ("A person who violates the provisions of KRS 186.450(4) or (5) shall be guilty of a violation.").

[7] The power of arrest accorded to Kentucky law enforcement officers under KRS 431.005(1) includes the authority to arrest an individual without a warrant when the officer observes a misdemeanor offense, as defined by KRS 431.060, being committed in his or her presence.  KRS 431.005(1)(d) (Michie Supp. 2008).  No mention is made of a violation of KRS 186.450(4) in KRS 431.005 defining the powers of arrest.  Additionally, the definition of a "violation" set forth in KRS 431.060(3) provides that violations are "**offenses punishable by a fine only or by any other penalty not cited herein.**" *Id*. (emphasis added).  Accordingly,

Here, the critical question is not one of state law, it is one of federal constitutional law - - whether the two detectives had probable cause under the Fourth Amendment to arrest Sullivan at the time that they took him into custody.  This exact distinction has been fundamental to the outcome of a number of civil rights actions for false arrest in the Sixth Circuit.  One of the better examples of these cases is an earlier decision, *Pyles v. Raisor*, 60 F.3d 1211, 1215-16 (6th Cir. 1995).

*Pyles* involved the misdemeanor arrest of a Lexington woman who was believed to have unlawfully provided alcohol to a minor, a 17-year-old German exchange student at a music concert at Rupp Arena.  Although the circumstances surrounding the arrest were held sufficient to establish probable cause, the plaintiff argued in her § 1983 civil rights action that the defendant enforcement officer of the Kentucky Dept. of Alcoholic Beverage Control (ABC), did not actually observe the misdemeanor offense committed in his presence.  Consequently, under well-established Kentucky state law, he could not lawfully have arrested her for providing alcohol to a minor in violation of KRS 530.070(1)(a).

The Sixth Circuit rejected this argument.  *Pyles*, 60 F.3d at 1215.  The court agreed that Pyles, as a matter of state law, could not be lawfully arrested for a misdemeanor offense that was not committed in the presence of the arresting ABC officer.  *Id*.  The court continued in *Pyles*, however, to note that what was at issue was the federal constitutional standard of the Fourth Amendment with its protection to be arrested only upon probable cause. Because ample information supported an objectively reasonable belief that Pyles had violated the

---

Kentucky state law affords a state or local law enforcement officer no authority to arrest when a mere violation occurs in the officer's presence.

law, the court held that she was arrested based upon probable cause.  No constitutional violation of the Fourth Amendment occurred, even though state law had been exceeded.  *Id.*

A number of more recent Sixth Circuit opinions follow this same legal reasoning that differentiates violations of state law from those of federal constitutional law.  *Straub v. Kilgore*, 100 Fed. Appx. 379, 383 (6th Cir. 2004) (Kentucky's "in the presence" requirement for a state officer to make a warrantless arrest for a misdemeanor offense is a state-provided right that is not grounded in the U.S. Constitution); *see, Gardner v. Lenkins*, Case No. 5:09CV156-KKC, 2009 WL 1421042 (E.D. Ky. May 18, 2009) ("'A state ought to follow its law, but to treat a violation of state law as a violation of the Constitution is to make the federal government the enforcer of state law.  State rather than federal courts are the appropriate institutions to enforce state rules.'") (citing *Archie v. Racine*, 847 F.2d 1211, 1217) (7th Cir. 1988), *cert. denied*, 489 U.S. 1065 (1989)).  *See also, Parsons v. Hassen*, Case No. 07-CV-344-JBC, 2007 WL 4327960 at *2 (E.D. Ky. Dec. 7, 2007) ("A state law requirement that extends the protection afforded to an individual under the U.S. Constitution cannot be the basis for a [constitutional] § 1983 claim.") (citing *Pyles*, 60 F.3d at 1215).

This same reasoning has found its way into the criminal law as well as the federal case law of § 1983.  The U.S. Supreme Court in *Atwater v. City of Lago Vista*, 532 U.S. 318, 340, 354 (2001) addressed the constitutionality of a misdemeanor arrest for a state offense that under the law of the state involved, Texas, would not have permitted the officers to made a warrantless arrest of the defendant.  The law at issue was the Texas safety belt statute, Tex. Trans. Code Annotated § 545.413(a) (1999), which requires the front-seat passenger of a car equipped with safety belts to wear one and to so secure any small child riding in the front of the

vehicle.  *Id*.  Texas law provides that the violation of either of these provisions of § 545.413(a) or (b) is a misdemeanor punishable by fine not less than $25 or more than $50.  While Texas officers in certain circumstances have the authority to arrest a person found in violation of the seat belt laws without a warrant under § 543.001, the Texas statutes direct  the police in lieu of arrest to issue citations under §§543.003-543.005.  *Atwater*, 532 U.S. at 323.

In *Atwater*, a Lago Vista police officer who observed Atwater and her children riding without safety belts in a pickup truck, arrested the driver, Atwater, and charged her with the misdemeanor offense of driving without her seat belt fastened.  Atwater subsequently brought suit against the officer, alleging that he had committed an unreasonable seizure under the Fourth Amendment when he arrested her without a warrant for a misdemeanor offense that did not involve a breach of the peace as required by Texas state law.  *Id*. at 325-26.  In ultimately determining that the challenged actions of the officer did not violate Atwater's Fourth Amendment right to freedom from unreasonable seizure, the U.S. Supreme Court rejected Atwater's argument that her arrest was unconstitutional based upon state law that limited warrantless misdemeanor arrests to situations involving a breach of the peace.  The Supreme Court instead held that

> we confirm today that what our prior cases have intimated: a standard of probable cause applie[s] to all arrests, without the need to 'balance' the interests and circumstances involved in particular situations.  If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.

*Atwater*, 532 U.S. at 354.  *See also, Arkansas v. Sullivan*, 532 U.S. 769, 771-72 (2001) (Law enforcement officer had constitutional authority under the Fourth Amendment to arrest Arkansas

defendant for what under state law was a fine-only traffic violation) (citing *Atwater*, 532 U.S. at 318).  Our own circuit court has reiterated this view in *United States v. Dede*, 83 Fed. Appx. 732, 736-37 (6th Cir. 2003) (explaining that "if an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.") (citing *Atwater*, 532 U.S. at 354)).

Still more recently in *Virginia v. Moore*, ___ U.S. ___, 128 S.Ct. 1598 (2008), the Supreme Court reiterated its earlier views in *Atwater*.   *Moore* involved the state arrest of a Virginia driver, one "Chubs," whom state officers arrested after stopping him for driving on a suspended driver's license.  Under Virginia state law, arrest for driving on a suspended license is limited to certain circumstances, such as when police determine that the driver involved would refuse to discontinue his or her violation. *Moore,* 128 S. Ct. at 1602 (citing Va. Code Ann. § 19.2-74).

The Virginia courts later found that none of these required statutory circumstances for an arrest applied to Chubs.  Nevertheless, the officers arrested Chubs and searched his person, which resulted in the discovery of 16 grams of crack cocaine and $516 in cash.  Chubs subsequently moved to suppress the drugs from evidence arguing that, because his arrest had been unlawful as a matter of Virginia state law, the ensuing warrantless search incident to the unlawful arrest was itself a violation of the fourth amendment. *Id.*   The Virginia Supreme Court ultimately agreed and the case was taken before the U.S. Supreme Court on certiorari review.

On review, the Supreme Court concluded that no fourth amendment violation had occurred despite the unlawfulness of Chub's arrest as a matter of Virginia statutory law.   On this

16

point the Court explained that

> In a long line of cases, we have said that when an officer has
> probable cause to believe a person committed even a minor crime
> in his presence, the balancing of private and public interests is not
> in doubt. The arrest is constitutionally reasonable.

*Moore,* 128 S. Ct. at 1604 (citing *Atwater,* 532 U.S. at 354; *Devenpeck v. Alford,* 543 U.S. 146,

152 (2004); *Gernstein v. Pugh,* 420 U.S. 103, 111 (1975); *Briegar v United States,* 338 U.S. 160,

164 (1949)).

The upshot of these decisions is that even if we assume that Defendant Sullivan

immediately presented Det. Kaufling with a valid learner's permit upon being asked to produce

an operator's license, the detective would have probable cause under the Fourth Amendment to

arrest Sullivan for his violation of state traffic laws, even though the detective may well have

been mistaken, as a matter of state law, concerning his authority to arrest for a learner's permit

violation.  The *Moore, Atwater* and *Sullivan* decisions of the Supreme Court and the *Pyles*

decision of the Sixth Circuit  make clear that Fourth Amendment constitutional concerns do not

hang on purely issues of state law.  Thus, under either factual scenario, no violation of the Fourth

Amendment occurred merely because Det. Kaufling took Sullivan into custody so long as the

detective had probable cause to do so.

Under the Fourth Amendment a police officer will have probable cause to arrest

when, considering the totality of the circumstances, the information possessed by the officer at

the moment of arrest is "sufficient to lead a reasonable officer to conclude that the arrestee has

committed or is committing a crime."  *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir.), *cert.*

*denied*, 128 S. Ct.2938 (2008).  The existence of probable cause does not depend on evidence

that is completely convincing or even evidence that would be admissible at trial.  *Everson v.*

*Leis*, 556 F.3d 484, 498-99 (6th Cir. 2090) (citing *Harris*).  *See also*, *United States v. Smith*, 549

F.3d 355, 359-60 (6th Cir. 2008) ("[T]o determine whether probable cause exists to arrest a

suspect, 'we must determine whether at that moment the facts and circumstances within the

arresting officer's knowledge and of which he had reasonably trustworthy information were

sufficient to warrant a prudent person in believing that [a suspect] had committed or [was]

committing an offense.'") (citing *United States v. Romero*, 452 F.3d 610, 615 (6th Cir. 2006)).

      In making this type of Fourth Amendment inquiry, the Court must examine the

events that led up to the arrest and then decide "whether these historical facts, viewed from the

standpoint of an objectively reasonable police officer, amount to probable cause."  *United States*

*v. Torres-Ramos*, 536 F.3d 542, 555 (6th Cir. 2008) (citing *Maryland v. Pringle*, 540 U.S. 366,

371 (2003)).  Probable cause requires the arresting officer to establish more than mere suspicion,

but does not require that the arresting officer have information sufficient to establish a *prima*

*facie* case, much less establish guilt beyond a reasonable doubt.  *United States v. Strickland*, 144

F.3d 412, 416 (6th Cir. 1998).

      In this instance, Defendant Sullivan was arrested by Det. Kaufling after Sullivan

either failed to produce his operator's license upon being asked to do so by the detective, or he

produced a learner's permit.  Under either circumstance, the officer observed Sullivan operate a

motor vehicle in violation of Kentucky law.  An objectively reasonable officer in this situation

would have probable cause to arrest Sullivan.

      Further, the warrantless search of a suspect's person following a custodial arrest

based on probable cause requires no additional justification and is considered to be a lawful

search incident to arrest.  *United States v. Robinson*, 414 U.S. 218, 235 (1983).  *See also,*

18

*Gustafson v. Florida*, 414 U.S. 260, 266 (1973) (Officers were lawfully entitled to make a full search of the petitioner's person incident to his arrest after the petitioner was arrested for the offense of driving his automobile without a valid operator's license). Thus, based on the constitutionality of Sullivan's arrest, the warrantless search of Sullivan's immediate person incident to that arrest was also constitutional.

**The Warrantless Automobile Search.**

Det. Kaufling testified that upon Sullivan being arrested and placed in handcuffs, Det. Haight restrained Sullivan as Det. Kaufling looked inside the passenger compartment of the car. In the car, Det. Kaufling saw the previously-mentioned shoe box, which he opened to discovery several baggies of what appeared to be crack cocaine. After Kaufling seized the shoe box from the passenger compartment, he advised Sullivan of his *Miranda* rights from a *Miranda* card that the detective carried on his person. Det. Kaufling then asked Sullivan several questions. Sullivan did not respond, except to deny that he had a gun in the car. Det. Haight then opened the trunk of the automobile and immediately found the aforementioned handgun lying deep inside the trunk on the top of a speaker box.

The question now is whether these two warrantless searches of the car are constitutionally sound in light of the recent Supreme Court decision announced in *Arizona v. Gant*, 556 U.S. __ 129 S. Ct. 1710, 173 L.Ed.2d 485 (2009). At the time of Sullivan's arrest, Det. Kaufling and Det. Haight justified their respective warrantless searches of the Cadillac as being a search incident to arrest. In fact, the investigative report of Det. Kaufling indicates that the warrantless search of the vehicle on April 8, 2008 was conducted as a search incident to

arrest.

At that time, the then-existent federal case law of *New York v. Belton*, 453 U.S. 454 (1981) and *Chimel v. California*, 395 U.S. 752 (1969) clearly permitted such a search despite the fact that Sullivan was handcuffed and was standing approximately ten feet away from the vehicle with no realistic possibility of accessing it to obtain a weapon or to destroy evidence. *Belton* had been recently interpreted by the Sixth Circuit in *United States v. Nichols*, 512 F.3d 789, 796-97 (6th Cir. 2007) to permit a search of the entire passenger compartment of a vehicle in which an arrestee was found, regardless of whether the interior compartment was actually accessible to the arrestee at the time of the search." *See, United States v. Cowart*, Case No. 1:08CR-10119, 2009 WL 1588647 (W.D. Tenn. June 5, 2009)(discussing *Nichols* in the context of *Gant*).

Slightly more than one year after the search of Sullivan's automobile, however, the U.S. Supreme Court rendered the *Gant* decision, in which the Court ruled the broad interpretation of *Belton* applied in the lower courts is incorrect.  In *Gant* the Court returned to a far narrower application of the search incident to arrest exception to the warrant requirement.  In the words of the majority in *Gant*,

> Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe that the vehicle contains evidence of the offense of arrest.  When these justifications are absent, a search of the arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies.

*Gant*, 129 S. Ct. 1710, 1723-24, 173 L.Ed.2d 485 (2009).

Defendant Sullivan is correct in most respects that *Gant* is very similar to the

present case.  The defendant in *Gant* was arrested by police during a drug investigation on charges of driving on a suspended license.  *Gant*, 129 S. Ct. at 1715.  He was handcuffed and locked in the back of a patrol car where he could not access the interior of his own vehicle, which was searched by police without a warrant, resulting in the discovery of a gun and a bag of cocaine.  *Id.*  It was this search that the majority in *Gant* concluded could not be justified under a reasonable reading of the *Belton* and *Chimel* decisions.

It is clear that the search incident to arrest exception may not be successfully relied on by the police to justify their search of the white Cadillac following Sullivan's arrest on April 8, 2008.  Sullivan had no reasonable means to access the interior of the automobile at the time that Det. Kaufling entered it and discovered the shoe box of crack cocaine. Sullivan was not only handcuffed, but the handcuffs were being held by Det. Haight.  Sullivan simply could not have obtained a weapon from the vehicle or destroyed evidence therein under these circumstances.[8]

While the Court agrees with Sullivan that *Gant* controls the outcome, insofar as the officers' attempted reliance upon the search incident to arrest exception, this conclusion does not resolve the analysis nor necessarily require the suppression of those items recovered from

---

[8]  *But see, United States v. Davis*, Case No. 07-4163, 2009 WL 2446077 (6th Cir. Aug. 11, 2009) (distinguishing the *Gant* decision where the handcuffed suspect was not placed in a separate police vehicle at the time of the warrantless search, but rather was standing nearby his own vehicle and therefore could have potentially reached the interior of the vehicle). While the *Davis* decision does attempt to distinguish *Gant* on the basis that the handcuffed suspect was not placed in a separate police vehicle, this distinction seems to be relatively minor and certainly contrary to the spirit of *Gant* and its focus on a realistic examination of the circumstances of the arrest scene.  Accordingly, this Court declines to follow *Davis* in its efforts to factually distinguish *Gant* based merely on the fact that Sullivan was standing approximately ten feet from the Cadillac and had not been placed into a locked police cruiser at the time that Det. Kaufling entered Sullivan's automobile.

inside the passenger compartment and trunk of the vehicle.  *Gant* does not abrogate the other well-established exceptions to the warrant requirement relating to automobile searches.  The *Gant* Court observed that "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross*, 456 U.S. 798, 820-821, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) authorizes a search of any area of the vehicle in which evidence might be found....  *Ross* allows searches for evidence relevant to offenses other than the offense of arrest, and the scope of the search authorized is broader."  *Gant*, 129 S.Ct. at 1721.

Sullivan is of the opinion that the Government is limited solely to the search incident to arrest exception as the legal rationale to sustain the warrantless search. He protests that the recent efforts of the Government to try to justify the actions of Detectives Kaufling and Haight under the automobile exception to the warrant requirement are too little, too late, in view of the arresting officers' express and unavailing reliance on *Belton*.  In other words, Sullivan takes a "card laid is a card played" approach to the situation, arguing that the Government cannot at the last minute before the suppression hearing now come forward with an entirely new legal justification, *i.e.*, the automobile exception, in a futile attempt to save what plainly is an otherwise unconstitutional warrantless search.

The Court cannot accept this argument for at least one very important reason. The subjective belief or non-belief of the arresting officers that their actions in entering Sullivan's vehicle without a warrant were lawful based on the search incident to arrest exception is not the controlling factor. *Whren v. United States,* 517 U.S. 806, 813 (1996)("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *Soltesz v. City of Sandusky,* 138 F. Supp. 2d. 932, 936-37 (N.D. Ohio 2001)("The subjective belief of the

22

arresting officer concerning the lawfulness of his actions is immaterial in determining the existence of probable cause.").

The courts do not look to subjective beliefs, but rather focus upon the objective - - what an objectively reasonable officer would have concluded at the time given the information available to him from the totality of the circumstances.  *United States v. Herbin,* 343 F.3d 807, 809 (6th Cir. 2003)("Just as a subjective belief by the arresting officer would not establish probable cause where none existed, a subjective belief by the arresting officer cannot destroy probable cause where it exists.").  Thus, whether Detectives Kaufling and Haight believed or not that their actions were legally justified under *Belton* or, alternatively, that they were justified to search based on probable cause and the automobile exception created by *Carroll v. United States*, 267 U.S. 132, 153 (1925), is not the determinative consideration.  Rather, the more important question is whether their actions on April 8, 2008 where those of an objectively reasonable officer acting on probable cause based on the totality of the information available at the time of the warrantless searches of the automobile.

In *Carroll*, the Supreme Court created another exception to the warrant requirement for automobile searches, recognizing that "it is not practical to secure a [search] warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought," and therefore, when an officer has probable cause to search a vehicle, "a [warrantless] search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained."  *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (quoting *United States v. Ross*, 456 U.S. 798, 809 (1982)).

The automobile exception to the warrant requirement exists when law

enforcement officers have probable cause to believe that a vehicle may contain evidence of a crime. *See Carroll* at 153-55. Traditionally, the "automobile exception," rests on the ready mobility of automobiles and the fleeting opportunity of police to search them for evidence of crime where officers have probable cause to believe that such items will be found in the vehicle. *Chambers v. Maroney*, 399 U.S. 42, 50-52 (1970).

An additional justification, the reduced privacy expectation of the occupants of a vehicle, is discussed by the Supreme Court in *California v. Carney*, 471 U.S. 386, 391-92 (1985) as another basis on which to rest the automobile exception. Hence, no need for extraordinary or exigent circumstances exists in order to apply the automobile exception to the warrant requirement. So long as the vehicle involved is mobile, and the searching officer has probable cause to believe that the fruits of crime may be found therein, the vehicle may be searched without a warrant. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). The scope of the search extends to all locations in the vehicle, including closed containers, where there is probable cause to believe the object of the search might be found. *U.S. v. Ross*, 456 U.S. 798, 824 (1982).

The probable cause determination under this exception is in all respects identical to the probable cause analysis employed in search warrant analysis, with the exception that the strong preference that exists for upholding search warrants obviously does not apply in the context of the warrantless automobile exception. Otherwise, probable cause in this context is merely reasonable grounds for belief supported by less than *prima facie* proof but more than mere suspicion that evidence or fruits of criminal activity will be found in the vehicle involved at the time of the search. *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998); *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998).

Whether probable cause exists at the time of the search is to be determined in a commonsense, practical fashion based on an examination of the totality of the circumstances. *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) (citing *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)).  In determining whether such probable cause exists to justify the application of the automobile exception, the Court may not take into consideration events that occurred *after* the search, nor may it consider the subjective intent of the officers involved. Smith, 510 at F.3d 647.  Instead, the Court looks to the objective facts as they were known to the officers at the time of the search.  Id.  All that is required is that such circumstances reveal a fair probability that contraband or evidence of a crime will be found in the particular vehicle involved.  *United States v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002).

Review of the totality of the circumstances strongly indicates to the Court than an objectively reasonable officer in the position of Detectives Kaufling and Haight would have had more than sufficient information on which to satisfy the liberal probable cause standard to search Sullivan's automobile for the weapon recently discharged in the reported shooting.  The detectives received information concerning a man shooting a firearm behind the tavern located in the 1600 block of Dixie Hwy.  Within five minutes of receiving this initial report, they arrived on the scene. Moments later, the radio dispatcher sent a second report notifying the officers of an individual driving a white Cadillac automobile believed to be involved in the shooting.

Within mere seconds of receiving this second report, the officers who were at that time located in the alley behind the tavern, saw Defendant Sullivan driving a white Cadillac in the alleyway.  As they watched, Sullivan drove the Cadillac into the driveway at 1815 W. Lee Street and exited the vehicle, which had no other occupants.  As the officers approached to

question Sullivan, he began to walk purposefully toward the home away from the vehicle.  Upon being stopped, Sullivan appeared to be nervous and blatantly denied that he had been driving the vehicle, even though the officers had just watched him drive the Cadillac onto the driveway of the residence, get out of the same automobile and begin to walk toward the home with the car keys in his hand.

All of these facts taken into account in their totality would create in the mind of an objectively reasonable officer the belief that probable cause existed to search Sullivan's automobile for the firearm used in the recent shooting in the alley way behind the tavern. Accordingly, a separate and adequate constitutional basis existed under the automobile exception to the search warrant requirement to justify the actions of Detectives Kaufling and Haight in searching Sullivan's Cadillac for the weapon mentioned in the police dispatch.  The fact that Kaufling and Haight possibly may not have subjectively believed at that moment that probable cause existed under the automobile exception to justify their searches does not in the Court's view negate the more relevant legal conclusion that an objectively reasonable officer confronted with the same circumstances would have found probable cause to search for the firearm in Sullivan's vehicle.  This conclusion is controlling and renders the officers' warrantless search of his Cadillac lawful under the automobile exception.

The Court also finds that the scope of the search of the Cadillac was reasonable. Det. Kaufling testified that in his experience, "shooting" runs often involve handguns or possibly rifles.  (DN 26, p. 34).  A handgun could easily be concealed in a shoe box, and the search of that closed container was lawful.  *Ross* at 824.  The narcotics found in the shoe box were readily identifiable as contraband and subject to seizure.  The search lawfully extended to the trunk of

the vehicle, as it was a place where a handgun could easily be hidden.

The decision announced in *United States v. Lopez,* 567 F.3d. 775 (6th Cir. 2009) and supplied to the court by Sullivan in his post-hearing supplemental memorandum does not change to the Court's viewpoint on the matter. *Lopez* is a search incident to arrest decision that is materially distinguishable from the facts of the present case in at least one significant respect. The difference is that *Lopez* did not involve an alternative constitutional basis for the warrantless search of the defendant's automobile, which was stopped after the defendant was charged with reckless driving for driving more than 100 mph on I-75 in Kentucky. The officer in *Lopez* searched the vehicle without a warrant based only on *Belton*. Thus, when *Belton* was rejected in *Gant*, no other constitutional basis existed for the challenged search. Here we have the probable cause requirement of the automobile exception as a totally independent, constitutionally adequate, ground on which to satisfy the Fourth Amendment reasonableness requirement. *Lopez* therefor does not require a different result than that reached by the Court.

Sullivan makes a final effort to challenge the reliance upon the automobile exception with his claim that the vehicle was not mobile, and therefore did not fall within the justification for the exception, given that Det. Kaufling had possession of the car keys and Sullivan was in custody at the time of the search. This argument while not unreasonable runs headlong into *Michigan v. Thomas*, 458 U.S. 259, 261 (1982), which provides that "the justification to conduct such a warrantless search does not vanish once the car has been immobilized." *Thomas*, 458 U.S. 259, 261 (1982). *See also, United States v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002) ("The automobile exception is applicable even in nonexigent circumstances....").

27

Here, no question exists but that the Cadillac was operable.  In fact, the detective had seen Sullivan operating the vehicle moments before his arrest.  It therefore cannot be said that the vehicle was no longer capable of being driven away.  It could still be driven off,  if not by Sullivan, then by some member of his family, whom Det. Kaufling testified were all standing nearby watching the events unfold in the backyard from the deck of their house.  Accordingly, this final argument by Sullivan is equally unpersuasive.  The warrantless search of Sullivan's Cadillac, while not constitutionally sound as a search incident to arrest after *Gant*, was lawful in its inception and scope under the automobile exception to the warrant requirement.  For these reasons, the Magistrate Judge shall recommend to the District Court below that the motion of the defendant to suppress be denied with prejudice.[9]

## RECOMMENDATION

The Magistrate Judge having made findings of fact and conclusion of law recommends that the motion of Le'Angelo Sullivan to suppress evidence be **DENIED WITH PREJUDICE.**

November 5, 2009

**Dave Whalin, Magistrate Judge**
**United States District Court**

---

[9]  Although the written motion to suppress filed by Sullivan made no mention of his oral statements, counsel agreed at the outset of the hearing that such statements would be included within the scope of the motion.  The only statements made by Sullivan include a pre-arrest denial that he had operated the vehicle and his post-arrest denial that the vehicle contained a firearm. Both statements were lawfully obtained.  The former one was entirely voluntary and made prior to Sullivan being taken into custody.  (DN 26, p. 20).  The latter one was made after Sullivan received and acknowledged his *Miranda* warnings.  (DN 26, p. 26).  According, neither statement is subject to suppression.

28

## <u>NOTICE</u>

Within ten (10) days after being served a copy of these proposed Findings and Recommendation, any party who wishes to object must file and serve written objections or further appeal is waived.  <u>Thomas v. Arn</u>, 728 F.2d 813 (6th Cir. 1984), <u>aff'd.</u>, 474 U.S. 140 (1985).  28 U.S.C. § 636(b)(1)(c); Fed.R.Civ.P. 72(b).

Copies to Counsel of Record