**UNITED STATES OF AMERICA**                                            **PLAINTIFF**

**v.**

**LE'ANGELO D. SULLIVAN**                                               **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Defendant's Motion to Suppress Tangible Evidence and Statements (Docket #16). The government has responded (Docket #17). A hearing was held before Magistrate Judge Dave Whalin on August 31, 2009. Judge Whalin issued his Report and Recommendations on November 6, 2009 (Docket #28). Defendant filed objections on November 30, 2009 (Docket #32). Defendant has also filed a motion for oral argument (Docket #33) to address his objections. For the following reasons, the Court declines to adopt the Magistrate's recommendation, and GRANTS Defendant's motion to suppress.

## BACKGROUND

The Report and Recommendations lays out the facts as follows:

The events that resulted in the prosecution of Le'Angelo Sullivan began at approximately 5 p.m. on April 8, 2008. On that date, Louisville Metro Police Department (LMPD) detectives James Kaufling and David Haight were on duty near the second division LMPD substation when they received a radio dispatch. (DN 26, Transcript of Suppression Hearing, p. 12). The police dispatcher reported only that a man in the 1600 block of Dixie Hwy. was shooting a gun in the alley behind Martin's Tavern. (*Id*.). No other information was provided in this first dispatch.

Detectives Haight and Kaufling immediately set out from the substation driving together to the scene of the shooting. (DN 26, p. 13). Det. Kaufling testified that the officers' vehicle arrived on the scene in the alley behind the tavern within three-to-five minutes of receiving the dispatch, which Det. Kaufling conceded was not very detailed. (*Id*. at 13-14). The officers drove through the back alley and circled the block. As they returned to the alley, they received a second LMPD

radio dispatch advising them that the man with the gun was in a white Cadillac. (*Id*. at 15). No other information was provided such as the license plate of the vehicle, a description of the man therein, the nature of the shooting, or any other background information. (DN 26, p. 33-34, 36). As Det. Kaufling described the second radio dispatch, "It was very vague."

On their second drive through the alleyway, immediately after they received this second dispatch, Dets. Kaufling and Haight saw a white Cadillac in the public alley as it pulled into the backyard driveway of a residence located at 1815 W. Lee. (DN 26, p. 15, 18). As the detectives watched, Sullivan exited the car and began walking purposefully toward the home. (*Id*. at 20-21). Dets. Kaufling and Haight exited their vehicle and approached Sullivan in the backyard of his home to ask him about the shooting incident. (*Id*. at 19). At this point, Sullivan was located approximately 10 feet from the parked Cadillac. (*Id*. at 20). Det. Kaufling saw no other individual in the Cadillac. (*Id.*).

When asked about the shooting or whether he had been driving the white Cadillac, Sullivan denied that he had been driving the Cadillac or that he had been involved in shooting a firearm. According to Det. Kaufling, Sullivan appeared to be "a little nervous, kind of fidgety." (*Id*. at 21). Sullivan had the keys to the Cadillac in his hand. (*Id*. at 28). Det. Kaufling then asked Sullivan to produce his operator's license. Sullivan advised the officers that he did not have an operator's license. (*Id*. at 22). At that point, the detectives arrested Sullivan for driving without an operator's license. (*Id*.). Sullivan was placed in handcuffs. Det. Haight held onto the handcuffs as Sullivan stood there in his backyard. At that point, the detectives had not yet searched Sullivan's person or his vehicle. (*Id*.).

Det. Kaufling then used the car keys obtained from Sullivan to open the Cadillac. On the floorboard of the passenger side he saw a shoe box. (*Id*. at 23). Det. Kaufling entered the car and opened the shoe box. Inside the shoe box he saw two plastic bags of what appeared to him to be crack cocaine. (*Id*.). No other items were in the shoe box at that point. Upon the discovery of the shoe box, Det. Kaufling advised Sullivan of his *Miranda* rights. (*Id*. at 26). Sullivan acknowledged that he understood his rights and appeared to Det. Kaufling to understand them. (*Id*. at 26-27). Det. Kaufling then attempted to ask Sullivan several questions; however, Sullivan was unresponsive in most instances. (*Id*. at 27). When Det. Kaufling asked him if there was a weapon in the Cadillac, Sullivan responded, "No." (*Id*.). Det. Haight then opened the trunk of the Cadillac with Sullivan's car keys. (*Id*. at 28).

Upon opening the trunk, Det. Haight observed a 40 caliber Glock semi-automatic handgun lying deep inside the trunk on top of a speaker box. (*Id*. at 28-29). After the discovery of the handgun, the detectives conducted a search of Sullivan's person. (*Id*. at 31). Det. Kaufling discovered additional crack cocaine in

Sullivan's left front pants pocket. (*Id*. at 32). In his right back pocket was an electronic digital scale. (*Id*.). His right front pocket held $3,055 in cash. (*Id*.).

Throughout the entire sequence of events, members of Sullivan's family were milling about in the immediately area watching events unfold from the back porch of the home. (*Id*. at 30-31). Additional beat officers of the LMPD also were on the scene. (*Id*.). After the Glock handgun was discovered, an Alcohol Tobacco and Firearms (ATF) agent was summoned to work the scene as well.

At no time during any of these events did Det. Kaufling or Det. Haight attempt to obtain a search warrant. The incident report and the investigative memo prepared by Det. Kaufling both indicated that Sullivan and the Cadillac were searched incident to arrest. Not until the filing of the motion to suppress did the Government maintain that it relied upon the automobile exception to the warrant requirement as a basis for the search of Sullivan's Cadillac on April 8, 2008.

Defendant filed a motion to suppress "any and all tangible evidence and statements." The Magistrate Judge found that all evidence was admissible and recommended denial of the motion to suppress. Defendant filed objections, which the Court now considers.

## DISCUSSION

Defendant was subjected to a *Terry* stop within the backyard of his home. Under the standard set out in *Terry v. Ohio*, 392 U.S. 1, 30 (1968), a police officer with reasonable suspicion that criminal activity is afoot may make a warrantless stop of a person without violating the Fourth Amendment. Reasonable suspicion is determined by the totality of the circumstances. *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001). Although reasonable suspicion need not rise to the level of probable cause, detention of an individual must be based on more than a "hunch." *Terry*, 392 U.S. at 27.

In this case, Detectives Kaufling and Haight received two reports: that a man in the 1600 block of Dixie Highway was shooting a gun in the alley behind Martin's Tavern, and that the man with the gun was in a white Cadillac. After receiving these dispatches, Detectives Kaufling

and Haight saw a white Cadillac in the public alley which then pulled into the backyard

driveway of a residence.  Defendant exited the Cadillac and began walking toward his home.  At

this point, the detectives approached Defendant and conducted the *Terry* stop.  The detectives

had no further information other than the reports they received through dispatch, and they relied

on those reports to detain Defendant because he was driving a white Cadillac in the general

vicinity of the crime.

The government has presented no evidence as to the source of the information provided

to the detectives.  At the hearing before the Magistrate, Defendant's counsel speculated that the

tip was anonymous, which the government did not refute.  Absent any evidence demonstrating

otherwise, the Court proceeds on the basis that the information given to the detectives was based

on an anonymous tip.

A police officer may not conduct a *Terry* stop solely on the basis of an anonymous tip.

*See, e.g.*, *Florida v. J.L.*, 529 U.S. 266, 270 (2000); *Alabama v. White*, 496 U.S. 325, 329 (1990)

("an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity");

*cf. Adams v. Williams*, 407 U.S. 143 (1972) (tip from a "known informant" contained sufficient

reliability to justify *Terry* stop).  In *J.L.*, the police received an anonymous tip that "a young

black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun."  529

U.S. at 268.  Acting on that tip, police officers went to the bus stop and observed three black

males, one of whom was wearing a plaid shirt.  *Id.*  The officers did not observe any firearms or

any other suspicious behavior.  *Id.* The Supreme Court found that the anonymous tip lacked the

necessary indicia of reliability to be considered sufficient to justify a *Terry* stop.  *Id.* at 271.

The Court distinguished *J.L.* from *Alabama v. White*, 496 U.S. 325 (1990).  In *White*, the

Supreme Court found that an anonymous tip that also accurately predicted a suspect's future actions, and was corroborated by police, was enough to justify a *Terry* stop. *White*, 496 U.S. at 331. As the Court explained in *J.L.*, "[o]nly after police observation showed that the informant had accurately predicted the woman's movements . . . did it become reasonable to think the tipster had inside knowledge . . . ." *J.L.*, 529 U.S. at 270. The Supreme Court acknowledged that even *White* was a borderline case. *Id.* at 271.

In sum, an anonymous tip must be accompanied by some additional indicia of reliability. *See id.* In the present case, the detectives relied solely on the anonymous tip to conduct the *Terry* stop of Defendant. Nothing in the tip provided any further indicia of reliability (such as prediction of future actions as in *White*), nor did the detectives corroborate any of the information prior to stopping Defendant. The detectives acted merely on the information they were given and stopped the first person they saw in the area in a white Cadillac. They observed no other suspicious behavior. This case is analogous to *J.L.*, and therefore, the anonymous tip was insufficient to justify the *Terry* stop.

Because the *Terry* stop of Defendant was a violation of the Fourth Amendment, all evidence obtained as a direct result of the violation must be excluded. *Segura v. United States*, 468 U.S. 796, 804 (1984) ("Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion."). Evidence may still be admissible, however, if it was subject to inevitable discovery, *Nix v. Williams*, 467 U.S. 431, 443-44 (1984), or "so attenuated as to dissipate the taint" of the violation, *Segura*, 468 U.S. at 805 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

In this case, the detectives would not have discovered any of the evidence, either on

Defendant's person or in the Cadillac, absent the initial Fourth Amendment violation. Any statements made by Defendant occurred after police had already conducted the illegal *Terry* stop. Further, discovery of the evidence on Defendant's person came about as a direct result of the violation and cannot be found to have been "attenuated." Any evidence discovered in the car is also connected to the violation. Even if the detectives' search of the vehicle was found to be attenuated, the detectives clearly lacked probable cause to search the vehicle since the anonymous tip was insufficient to justify even reasonable suspicion. Therefore, the Court finds that Defendant's motion to suppress must be granted.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's Motion to Suppress Tangible Evidence and Statements is GRANTED. Because this Motion is granted, Defendant's Motion for Oral Argument is DENIED as moot.