# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# LOUISVILLE DIVISION
# CASE NO. 3:09-CR-28

**UNITED STATES OF AMERICA**                                           **PLAINTIFF**

v.

**LE'ANGELO D. SULLIVAN**                                                  **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Plaintiff's Motion to Reconsider Opinion and Order Granting Sullivan's Motion to Suppress Tangible Evidence and Statements (Docket #36). Defendant has responded (Docket #37). An evidentiary hearing was held on March 15, 2010. This matter is now ripe for adjudication.

## BACKGROUND

Magistrate Judge Whalin's Report and Recommendations set out the facts of this case as follows:

> The events that resulted in the prosecution of Le'Angelo Sullivan began at approximately 5 p.m. on April 8, 2008. On that date, Louisville Metro Police Department (LMPD) detectives James Kaufling and David Haight were on duty near the second division LMPD substation when they received a radio dispatch. (DN 26, Transcript of Suppression Hearing, p. 12). The police dispatcher reported only that a man in the 1600 block of Dixie Hwy. was shooting a gun in the alley behind Martin's Tavern. (*Id.*). No other information was provided in this first dispatch.
>
> Detectives Haight and Kaufling immediately set out from the substation driving together to the scene of the shooting. (DN 26, p. 13). Det. Kaufling testified that the officers' vehicle arrived on the scene in the alley behind the tavern within three-to-five minutes of receiving the dispatch, which Det. Kaufling conceded was not very detailed. (*Id.* at 13-14). The officers drove through the back alley and circled the block. As they returned to the alley, they received a second LMPD radio dispatch advising them that the man with the gun was in a white Cadillac. (*Id.* at 15). No other information was provided such as the license plate of the vehicle, a description of the man therein, the nature of the shooting, or any other background information. (DN 26, p. 33-34, 36). As Det. Kaufling described the

second radio dispatch, "It was very vague."

On their second drive through the alleyway, immediately after they received this second dispatch, Dets. Kaufling and Haight saw a white Cadillac in the public alley as it pulled into the backyard driveway of a residence located at 1815 W. Lee. (DN 26, p. 15, 18). As the detectives watched, Sullivan exited the car and began walking purposefully toward the home. (*Id*. at 20-21). Dets. Kaufling and Haight exited their vehicle and approached Sullivan in the backyard of his home to ask him about the shooting incident. (*Id*. at 19). At this point, Sullivan was located approximately 10 feet from the parked Cadillac. (*Id*. at 20). Det. Kaufling saw no other individual in the Cadillac. (*Id.*).

When asked about the shooting or whether he had been driving the white Cadillac, Sullivan denied that he had been driving the Cadillac or that he had been involved in shooting a firearm. According to Det. Kaufling, Sullivan appeared to be "a little nervous, kind of fidgety." (*Id*. at 21). Sullivan had the keys to the Cadillac in his hand. (*Id*. at 28). Det. Kaufling then asked Sullivan to produce his operator's license. Sullivan advised the officers that he did not have an operator's license. (*Id*. at 22). At that point, the detectives arrested Sullivan for driving without an operator's license. (*Id*.). Sullivan was placed in handcuffs. Det. Haight held onto the handcuffs as Sullivan stood there in his backyard. At that point, the detectives had not yet searched Sullivan's person or his vehicle. (*Id*.).

Det. Kaufling then used the car keys obtained from Sullivan to open the Cadillac. On the floorboard of the passenger side he saw a shoe box. (*Id*. at 23). Det. Kaufling entered the car and opened the shoe box. Inside the shoe box he saw two plastic bags of what appeared to him to be crack cocaine. (*Id*.). No other items were in the shoe box at that point. Upon the discovery of the shoe box, Det. Kaufling advised Sullivan of his *Miranda* rights. (*Id*. at 26). Sullivan acknowledged that he understood his rights and appeared to Det. Kaufling to understand them. (*Id*. at 26-27). Det. Kaufling then attempted to ask Sullivan several questions; however, Sullivan was unresponsive in most instances. (*Id*. at 27). When Det. Kaufling asked him if there was a weapon in the Cadillac, Sullivan responded, "No." (*Id*.). Det. Haight then opened the trunk of the Cadillac with Sullivan's car keys. (*Id*. at 28).

Upon opening the trunk, Det. Haight observed a 40 caliber Glock semi-automatic handgun lying deep inside the trunk on top of a speaker box. (*Id*. at 28-29). After the discovery of the handgun, the detectives conducted a search of Sullivan's person. (*Id*. at 31). Det. Kaufling discovered additional crack cocaine in Sullivan's left front pants pocket. (*Id*. at 32). In his right back pocket was an electronic digital scale. (*Id*.). His right front pocket held $3,055 in cash. (*Id*.).

Throughout the entire sequence of events, members of Sullivan's family were

> milling about in the immediately area watching events unfold from the back porch of the home. (*Id*. at 30-31). Additional beat officers of the LMPD also were on the scene. (*Id*.). After the Glock handgun was discovered, an Alcohol Tobacco and Firearms (ATF) agent was summoned to work the scene as well.
>
> At no time during any of these events did Det. Kaufling or Det. Haight attempt to obtain a search warrant. The incident report and the investigative memo prepared by Det. Kaufling both indicated that Sullivan and the Cadillac were searched incident to arrest. Not until the filing of the motion to suppress did the Government maintain that it relied upon the automobile exception to the warrant requirement as a basis for the search of Sullivan's Cadillac on April 8, 2008.

Defendant filed a motion to suppress "any and all tangible evidence and statements." The Magistrate Judge found that all evidence was admissible and recommended denial of the motion to suppress. Defendant filed objections. The Court rejected the Magistrate's Report and Recommendations and granted the motion to suppress in its January 29, 2010 Order. The government now asks the Court to reconsider its ruling.

An evidentiary hearing on this motion was held on March 15, 2010. Detectives Kaufling and Haight testified for the government. The detectives stated that they approached Sullivan by walking towards him and asking him if he would speak with them. Detective Haight approached from the direction of the house, so that he was between Sullivan and his house at the time of the encounter. Detective Kaufling's approach took him towards Sullivan's vehicle. The officers stated that they did not threaten Sullivan nor draw their weapons. They never told Sullivan he could not walk away. Further, Sullivan began to respond to their questions. The report written by Detective Kaufling shortly after the incident stated that he "stopped and talked to Mr. Sullivan." Sullivan and his mother also testified at the hearing. Both stated that the officers approached them and told them to stop, and that their hands were poised over their guns as they approached. Sullivan testified that he was trying to get into the house at the time they stopped him, and he

only stopped when he was told to do so by the detectives.

## DISCUSSION

This Court issued a Memorandum Opinion and Order on January 29, 2010, granting Defendant's motion to suppress because the police lacked reasonable suspicion to conduct a *Terry* stop of Defendant in the backyard of his home. This reasoning was based on the fact that the police officers who stopped Defendant were acting pursuant to an anonymous tip, unaccompanied by any additional indicia of reliability. The Court's finding that the *Terry* stop was a violation of Defendant's Fourth Amendment rights mandated the exclusion of all evidence obtained as a result of that violation. The government now asks the Court to reconsider its Order.

The government makes several arguments in favor of its motion. First, the government asserts that the initial police encounter with Defendant was not a *Terry* stop, but a "consensual encounter." In the alternative, the government asks the Court to find that the police had adequate information for a finding of reasonable suspicion. Finally, the government argues that the searches of Defendant's person and vehicle were valid.

According to the Sixth Circuit, there are three types of police-citizen encounters: "'consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or *Terry* stop which must be predicated upon reasonable suspicion; and arrests which must be based on probable cause.'" *United States v. Campbell*, 486 F.3d 949, 953-54 (6th Cir. 2007) (quoting *United States v. Bueno*, 21 F.3d 120, 123 (6th Cir. 1994)). A consensual encounter between police and citizens occurs when police officers "approach[ ] an individual on the street or in another public place" and ask questions or inquire if the citizen is willing to

answer some questions. *Florida v. Royer*, 460 U.S. 491, 497 (1983). It does not require any finding of suspicion or probable cause because it does not constitute a "seizure." *Bennett v. City of Eastpointe*, 410 F.3d 810, 821 (6th Cir. 2005) ("It is only when an officer restrains an individual's liberty 'by means of physical force or show of authority' that Fourth Amendment protections attach."); *Campbell*, 486 F.3d at 954 ("If there is no detention–no seizure within the meaning of the Fourth Amendment–then no constitutional rights have been infringed." (citing *Royer*, 460 U.S. at 497)). "A seizure occurs when 'under the totality of the circumstances, a reasonable person would have believed that he or she was not free to walk away.'" *United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004) (quoting *United States v. Saperstein*, 723 F.2d 1221, 1225 (6th Cir. 1983)).

The government argues that the police officers' initial contact with Defendant was merely a consensual encounter in which the police approached Defendant as he was walking toward his house and asked if they could speak with him. The government asserts that there was no showing of authority, and a reasonable person in Defendant's situation would have felt free to leave. It was only after Defendant began speaking with the officers and told them that he had not been driving the white Cadillac that the police encounter progressed to a *Terry* stop.

The officers' encounter with Defendant occurred in the backyard of his home, not in a public place. All of the cases cited by the government involve consensual encounters occurring in public places. *See, e.g.*, *Florida v. Bostick*, 501 U.S. 429, 431 (1991) (police questioning occurred on a bus); *United States v. Foster*, 376 F.3d 577, 581 (6th Cir. 2004) (defendant questioned on the street near an apartment complex); *United States v. Waldon*, 206 F.3d 597, 601 (6th Cir. 2000) (officer approached a man standing at a bus stop); *United States v. Baro*, 15 F.3d

5

563, 565 (6th Cir. 1994) (defendant approached and questioned in an airport). Defendant argues that consensual encounters occur in public places, not "the sanctity of the curtilage of a private residence." In support of this argument, Defendant points out that Fourth Amendment protection extends to the curtilage of a home. *See Young v. City of Radcliff*, 561 F. Supp. 2d 767, 784 (W.D. Ky. 2008) (citing *Oliver v. United States*, 466 U.S. 170, 177 (1984)).

The Sixth Circuit has held that curtilage includes "the land surrounding and associated with the home which 'harbors the intimate activity associated with the sanctity of a man's home and the privacies of life.'" *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 652 (6th Cir. 2006) (quoting *United States v. Dunn*, 480 U.S. 294, 300 (1987)). The evidence in this case indicates that Defendant's backyard was part of the curtilage of his home, and that the police officers were aware of the fact that they were on private property at the time they approached Defendant. However, even if Fourth Amendment protections apply to Defendant's backyard, these protections do not become relevant until the point at which Defendant was "seized." Therefore, if the encounter between Defendant and the police officers truly was consensual, the Fourth Amendment does not apply.[1]

The key inquiry becomes, therefore, whether Defendant was seized. A seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away . . . ."

---

[1]As the Magistrate pointed out in his Report and Recommendations, police officers may enter onto private property if their entry is in furtherance of a "legitimate law enforcement objective." *United States v. Weston*, 443 F.3d 661, 667 (8th Cir. 2006). *Accord United States v. Taylor*, 458, F.3d 1201, 1205 (11th Cir. 2006); *Estate of Smith v. Marlasco*, 430 F.3d 140, 158 (3d Cir. 2005); *United States v. Hammett*, 236 F.3d 1054, 1059 (9th Cir. 2001). The Sixth Circuit has permitted officers to enter private property for the purpose of furthering a "knock and talk" investigative technique. *Hardesty*, 461 F.3d at 654. The Court agrees with the Magistrate that the police officers' mere encroachment upon the curtilage is not in and of itself a violation of the Fourth Amendment.

*Terry v. Ohio*, 392 U.S. 1, 16 (1968). The evidence is clear that the police officers did not physically restrain Defendant until he was under arrest. Therefore, in order for this encounter to be considered a seizure, the officers must have used some sort of "show of authority" to restrain Defendant. *Bennett*, 410 F.3d at 821. This show of authority must have been enough to make a reasonable person in Defendant's position believe "he or she was not free to walk away." *Alston*, 375 F.3d at 411. "'The test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'" *Gardenhire v. Schubert*, 205 F.3d 303, 313 (6th Cir. 2000) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)).

The Court finds that there was no show of authority in this case that would have made a reasonable person believe he was not free to leave. The police officers, in plainclothes attire, were in a police vehicle with no flashing lights. The vehicle did not block Defendant's driveway. The officers approached Defendant at a walking pace. Their guns were holstered. Defendant was never threatened, nor is there evidence that the detectives spoke in an authoritative tone of voice. This finding is consistent with prior case law. *See, e.g.*, *United States v. Drayton*, 536 U.S. 194, 203-04 (2002) (Plainclothes officer did not seize passengers on a bus where there was "no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice."); *United States v. Thomas*, 430 F.3d 274, 278 (6th Cir. 2005) (no seizure when officers knocked on door and there was no evidence of "'drawn weapons, raised voices, or coercive demands.'" (citation omitted)); *Mitchell v. United States*, 233 F. App'x 547, 550 (6th Cir. 2005)

7

(No seizure occurred when police responding to a shots fired call "did not have the squad car lights on or guns drawn; they simply approached on foot, and asked two questions."); *United States v. Foster*, 376 F.3d 577, 581 (6th Cir. 2004) (Defendant was not seized when police approached him on foot, asked him his name, what he was doing there, and if he had any form of identification.).

Defendant argues that the officers testified that they "stopped" Defendant, and Detective Kaufling's memorandum report stated he "stopped and talked to Mr. Sullivan." However, whether the police officers thought the encounter was a stop or not is irrelevant. *See United States v. Taylor*, 956 F.2d 572, 576 n.2 (6th Cir. 1992) (en banc) ("'The subjective intent of the officers is relevant to an assessment of the fourth amendment implications of police conduct *only to the extent that that intent has been conveyed to the person confronted*.'" (citations omitted) (emphasis in original)).

Because the Court finds that the original encounter between Defendant and the police officers was a consensual encounter, the Court must now reexamine its ruling on the motion to suppress. In the original opinion, the Court relied on the illegal *Terry* stop to suppress all evidence obtained following that encounter. The Court now reconsiders the admissibility of the evidence found in Defendant's car and on his person.

After the police officers encountered Defendant, they asked him if he had been driving the white Cadillac. Although Defendant stated he had not, the police officers had observed Defendant pull into the rear driveway and exit the vehicle. The police officers next asked Defendant if he had a driver's license. Although there is some question about what Defendant produced at that time, he did not have a valid driver's license. At this point, the police had

probable cause to believe that Defendant had committed a crime. The police officers lawfully placed Defendant under arrest. *See, e.g.*, *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("An arrest is reasonable under the Fourth Amendment if there has been execution of an arrest warrant or there is probable cause that the defendant has committed a crime."). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

After the officers arrested Defendant, they did an initial pat down to search Defendant for weapons. Finding none, the officers proceeded to search the car. At this point in time, the officers did not have probable cause to search the vehicle.[2] Police may search a vehicle without a warrant so long as they have probable cause. As explained in the Court's prior opinion, relying on an anonymous tip without further corroboration is not enough to establish even reasonable suspicion, let alone probable cause. *See Florida v. J.L.*, 529 U.S. 266, 270 (2000). The officers had received no additional corroborating evidence to indicate that a gun would be found in the car. The additional information obtained by the police officers that Defendant had been driving the car without a license did not give the officers reason to believe that any evidence of criminal activity would be located in the vehicle. *See Arizona v. Gant*, 129 S. Ct. 1710, 1721 (2009) (citing *United States v. Ross*, 456 U.S. 798, 829-21 (1982)).

---

[2]As the Magistrate Judge pointed out in his Report and Recommendations, the police officers could not rely upon the search incident to arrest exception to search Defendant's vehicle without a warrant. *See Arizona v. Gant*, 129 S. Ct. 1710, 1723-24 (2009) ("Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe that the vehicle contains evidence of the offense of arrest."). Defendant was located several feet away from the vehicle and placed in handcuffs at the time the officers searched the vehicle.

Because the search of Defendant's vehicle was a violation of the Fourth Amendment, all evidence obtained as a direct result of the violation must be excluded. *Segura v. United States*, 468 U.S. 796, 804 (1984) ("Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion."). "The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)). The police officers only searched Defendant's person again after they discovered drugs in Defendant's car. Therefore, the items discovered on Defendant's person were "derivative evidence" stemming from the illegal search of the vehicle.

As the Court examined these issues, it became clear that this opinion may open the door to further arguments, such as inevitable discovery. Therefore, the Court has scheduled a hearing on April 19, 2010, at 12:30 p.m. EDT for the parties to present oral arguments and additional evidence on any and all suppression issues. Prior to the hearing, the parties shall notify each other if they are going to submit any additional evidence.

## CONCLUSION

IT IS HEREBY ORDERED that a hearing on any and all suppression issues is SET for **April 19, 2010, at 12:30 p.m. EDT**.