UNITED STATES OF AMERICA                                          PLAINTIFF

v.

LE'ANGELO D. SULLIVAN                                              DEFENDANT


## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Plaintiff's Motion to Reconsider Opinion and Order

Granting Sullivan's Motion to Suppress Tangible Evidence and Statements (Docket #36).

Defendant has responded (Docket #37). An evidentiary hearing was held on March 15, 2010.

The Court issued a memorandum opinion on March 26, 2010 (Docket #42), scheduling a further

hearing, which was held on April 19, 2010. This matter is now ripe for adjudication.

## BACKGROUND

Magistrate Judge Whalin's Report and Recommendations set out the facts of this case as

follows:

> The events that resulted in the prosecution of Le'Angelo Sullivan began at
> approximately 5 p.m. on April 8, 2008. On that date, Louisville Metro Police
> Department (LMPD) detectives James Kaufling and David Haight were on duty
> near the second division LMPD substation when they received a radio dispatch.
> (DN 26, Transcript of Suppression Hearing, p. 12). The police dispatcher reported
> only that a man in the 1600 block of Dixie Hwy. was shooting a gun in the alley
> behind Martin's Tavern. (*Id*.). No other information was provided in this first
> dispatch.
>
> Detectives Haight and Kaufling immediately set out from the substation driving
> together to the scene of the shooting. (DN 26, p. 13). Det. Kaufling testified that
> the officers' vehicle arrived on the scene in the alley behind the tavern within
> three-to-five minutes of receiving the dispatch, which Det. Kaufling conceded
> was not very detailed. (*Id*. at 13-14). The officers drove through the back alley
> and circled the block. As they returned to the alley, they received a second LMPD
> radio dispatch advising them that the man with the gun was in a white Cadillac.

(*Id*. at 15). No other information was provided such as the license plate of the vehicle, a description of the man therein, the nature of the shooting, or any other background information. (DN 26, p. 33-34, 36). As Det. Kaufling described the second radio dispatch, "It was very vague."

On their second drive through the alleyway, immediately after they received this second dispatch, Dets. Kaufling and Haight saw a white Cadillac in the public alley as it pulled into the backyard driveway of a residence located at 1815 W. Lee. (DN 26, p. 15, 18). As the detectives watched, Sullivan exited the car and began walking purposefully toward the home. (*Id*. at 20-21). Dets. Kaufling and Haight exited their vehicle and approached Sullivan in the backyard of his home to ask him about the shooting incident. (*Id*. at 19). At this point, Sullivan was located approximately 10 feet from the parked Cadillac. (*Id*. at 20). Det. Kaufling saw no other individual in the Cadillac. (*Id.*).

When asked about the shooting or whether he had been driving the white Cadillac, Sullivan denied that he had been driving the Cadillac or that he had been involved in shooting a firearm. According to Det. Kaufling, Sullivan appeared to be "a little nervous, kind of fidgety." (*Id*. at 21). Sullivan had the keys to the Cadillac in his hand. (*Id*. at 28). Det. Kaufling then asked Sullivan to produce his operator's license. Sullivan advised the officers that he did not have an operator's license. (*Id*. at 22). At that point, the detectives arrested Sullivan for driving without an operator's license. (*Id*.). Sullivan was placed in handcuffs. Det. Haight held onto the handcuffs as Sullivan stood there in his backyard. At that point, the detectives had not yet searched Sullivan's person or his vehicle. (*Id*.).

Det. Kaufling then used the car keys obtained from Sullivan to open the Cadillac. On the floorboard of the passenger side he saw a shoe box. (*Id*. at 23). Det. Kaufling entered the car and opened the shoe box. Inside the shoe box he saw two plastic bags of what appeared to him to be crack cocaine. (*Id*.). No other items were in the shoe box at that point. Upon the discovery of the shoe box, Det. Kaufling advised Sullivan of his *Miranda* rights. (*Id*. at 26). Sullivan acknowledged that he understood his rights and appeared to Det. Kaufling to understand them. (*Id*. at 26-27). Det. Kaufling then attempted to ask Sullivan several questions; however, Sullivan was unresponsive in most instances. (*Id*. at 27). When Det. Kaufling asked him if there was a weapon in the Cadillac, Sullivan responded, "No." (*Id*.). Det. Haight then opened the trunk of the Cadillac with Sullivan's car keys. (*Id*. at 28).

Upon opening the trunk, Det. Haight observed a 40 caliber Glock semi-automatic handgun lying deep inside the trunk on top of a speaker box. (*Id*. at 28-29). After the discovery of the handgun, the detectives conducted a search of Sullivan's person. (*Id*. at 31). Det. Kaufling discovered additional crack cocaine in Sullivan's left front pants pocket. (*Id*. at 32). In his right back pocket was an

electronic digital scale. (*Id*.). His right front pocket held $3,055 in cash. (*Id*.).

Throughout the entire sequence of events, members of Sullivan's family were milling about in the immediately area watching events unfold from the back porch of the home. (*Id*. at 30-31). Additional beat officers of the LMPD also were on the scene. (*Id*.). After the Glock handgun was discovered, an Alcohol Tobacco and Firearms (ATF) agent was summoned to work the scene as well.

At no time during any of these events did Det. Kaufling or Det. Haight attempt to obtain a search warrant. The incident report and the investigative memo prepared by Det. Kaufling both indicated that Sullivan and the Cadillac were searched incident to arrest. Not until the filing of the motion to suppress did the Government maintain that it relied upon the automobile exception to the warrant requirement as a basis for the search of Sullivan's Cadillac on April 8, 2008.

Defendant filed a motion to suppress "any and all tangible evidence and statements." The Magistrate Judge found that all evidence was admissible and recommended denial of the motion to suppress. Defendant filed objections. The Court rejected the Magistrate's Report and Recommendations and granted the motion to suppress in its January 29, 2010 Order. The Court found that the officers had conducted an illegal *Terry* stop and all evidence stemming from that illegal stop must be suppressed.

The government asked the Court to reconsider its ruling in a motion for reconsideration filed on February 26, 2010. An evidentiary hearing on this motion was held on March 15, 2010. Detectives Kaufling and Haight testified for the government. The detectives stated that they approached Sullivan by walking toward him and asking him if he would speak with them. Detective Haight approached from the direction of the house, so that he was between Sullivan and his house at the time of the encounter. Detective Kaufling's approach took him towards Sullivan's vehicle. The officers stated that they did not threaten Sullivan nor draw their weapons. They never told Sullivan he could not walk away. Further, Sullivan began to respond to their questions. The report written by Detective Kaufling shortly after the incident stated that he

"stopped and talked to Mr. Sullivan." Sullivan and his mother also testified at the hearing. Both

stated that the officers approached them and told them to stop, and that their hands were poised

over their guns as they approached. Sullivan testified that he was trying to get into the house at

the time they stopped him, and he only stopped when he was told to do so by the detectives.

The Court found in its March 26, 2010, Opinion that the interaction between Sullivan and

the officers was a "consensual encounter." However, the Court still ruled that no probable cause

existed to search the vehicle. Recognizing that this would open the door to issues of inevitable

discovery, the Court held a hearing on April 19, 2010. Detective Haight testified that he would

have searched Defendant's person further upon arrest and discovered the cash, drugs, and scale.

Further, his experience as a police officer would have led him to search the car because the items

found on Defendant were consistent with drug trafficking, and discovering more drugs in the car

would have been consistent with a trafficking profile. Defendant argued that because Sullivan

had an instruction permit, his true crime was driving without a licensed driver, which is a non-

arrestable offense under state law. Therefore, Defendant argued, the police could not make a

valid arrest, and there could be no inevitable discovery. The Court now considers whether the

inevitable discovery doctrine permits introduction of the evidence found in Defendant's vehicle

and on his person on April 8, 2008.

## DISCUSSION

The Court ruled in its March 26, 2010 Opinion that the police officers did not have

probable cause to search Defendant's vehicle after they arrested him for operating a car without

a license, and therefore, any evidence obtained as a result of that search must be excluded.

Moreover, because the officers did not search Defendant's person until after the illegal search of

4

the car, the evidence found on Defendant's person was tainted by the original Fourth

Amendment violation and also inadmissible. *See Segura v. United States*, 468 U.S. 796, 804

(1984) ("Evidence obtained as a direct result of an unconstitutional search or seizure is plainly

subject to exclusion."). Evidence may still be admissible, however, if it was subject to inevitable

discovery, *Nix v. Williams*, 467 U.S. 431, 443-44 (1984), or "so attenuated as to dissipate the

taint" of the violation, *Segura*, 468 U.S. at 805 (quoting *Nardone v. United States*, 308 U.S. 338,

341 (1939)).

     "The exclusionary rule prohibits the admission of evidence seized in searches and

seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative

evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497

(6th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)). The doctrine of

inevitable discovery is an exception to the exclusionary rule which "allows unlawfully obtained

evidence to be admitted at trial if the government can prove by a preponderance that the

evidence inevitably would have been acquired through lawful means." *Id.* (citing *Nix*, 467 U.S.

at 444). When this is the case, the deterrence rationale has so little basis the evidence should not

be suppressed. *Id.*

     In determining whether this exception applies, the district court, "viewing affairs as they

existed at the instant before the unlawful search, [must determine] what would have happened

had the unlawful search never occurred." *Kennedy*, 61 F.3d at 498. The Court should "keep

speculation at a minimum by focusing on 'demonstrated historical facts capable of ready

verification or impeachment.'" *United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999) (quoting

*United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996)). "The inevitable discovery exception to

the exclusionary rule applies when the government can demonstrate *either* the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence *or* other compelling facts establishing that the disputed evidence inevitably would have been discovered." *Kennedy*, 61 F.3d at 499 (emphasis in original). There is no evidence of an independent, untainted investigation in this case. Therefore, the government must produce compelling facts to demonstrate by a preponderance of the evidence that the tainted evidence would have been discovered.

Looking at the circumstances up to the unlawful search, the Court cannot conclude that the facts are so compelling as to find that the evidence in this case would have been inevitably discovered. First, a consensual encounter between the officers and Defendant occurred on Defendant's property. The officers questioned Defendant about his vehicle and asked for his operator's license. At this point, Defendant produced his instruction permit.[1] Operating a vehicle with an instruction permit but without an accompanying licensed driver is not an arrestable offense under Kentucky state law.[2] Still, under Fourth Amendment law, the police can lawfully

---

[1]Although there is some conflicting testimony, the Court finds that Defendant did produce his instruction permit to the officers. At the first suppression hearing on August 31, 2009, Detective Kaufling testified "I'm not sure if he said he had a license or he – he produced the I.D., which was an instructional permit." (DN 26, p. 43.) At the second hearing on March 15, 2010, Detective Haight also testified that Defendant produced a form of i.d. Finally, Defendant's instruction permit was pictured in a photograph taken on the date Defendant was arrested. This evidence is sufficient to conclude that the officers had knowledge of Defendant's instruction permit prior to the unlawful search of his vehicle.

[2]A person driving with an instruction permit "shall be accompanied by a person with a valid operator's license who is at least twenty-one (21) years of age occupying the seat beside the operator at all times." Ky. Rev. Stat. Ann. § 186.450(4). A person who violates this law is guilty of a "violation." Ky. Rev. Stat. Ann. § 186.990(3). A "violation" is an offense other than a misdemeanor or felony. *See* Ky. Rev. Stat. Ann. § 431.060(3). Pursuant to Kentucky statute, an officer may not arrest for a mere violation. *See* Ky. Rev. Stat. Ann. § 431.005(1).

arrest a person for even a very minor offense. *See, e.g.*, *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("An arrest is reasonable under the Fourth Amendment if there has been execution of an arrest warrant or there is probable cause that the defendant has committed a crime."); *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). After Defendant was placed in handcuffs, the officers conducted a pat-down for weapons. At any time between Defendant's arrest and the unlawful search of Defendant's vehicle, the officers could have conducted a more thorough search of Defendant's person, but the evidence shows that they did not. It was not until after the illegal search of the car that the officers conducted a more thorough search of Defendant's person.

For inevitable discovery, the government may show that evidence would have been discovered through "the existence of a routine procedure." *Kennedy*, 61 F.3d at 500. Detective Haight asserted that it is typical procedure for officers to thoroughly search a person who is under arrest, and it is not uncommon for a person to be searched multiple times. Detective Haight further acknowledged that he does not recall, during his eleven years on the force, ever arresting someone for an instruction permit violation. He also stated that it is within an officer's discretion to arrest or issue a citation for operating a vehicle without a license.

The Court finds that Detective Haight's statements do not amount to sufficient evidence of a "routine procedure." The fact that a thorough search was "typical" or that multiple searches were "not uncommon" does not establish that something was a routine policy. Further, Detective

Haight's own testimony that he did not arrest for permit violations and had discretion to arrest

for license violations speaks against any notion that a search under the circumstances of this case

would have been "routine." The government also failed to present any written police policies or

procedures. The Court notes that this case differs significantly from those inevitable discovery

cases that involve inventory searches conducted on impounded vehicles, *United States v. Kimes*,

246 F.3d 800, 804-05 (6th Cir. 2001), or booking procedures in which officers routinely

inventory a suspect's belongings at the police station. *See United States v. Gorski*, 852 F.2d 692,

696 (2d Cir. 1988). There is no evidence here that a more thorough search was an "invariable"

procedure. *Id.* Rather, the decisions made by the officers in this case were largely discretionary,

and not exercised according to standard criteria. *See Kimes*, 246 F.3d at 805.

The question is not *could* the officers have searched Defendant's person, but *would* they

have done so absent the unlawful search of the vehicle. *See Kennedy*, 61 F.3d at 498. In other

words, was a search inevitable? The Court finds that the government has failed to meet its

burden. For the reasons set forth in this Court's prior opinions, the evidence found on

Defendant's person and in his vehicle must be suppressed.

**CONCLUSION**

For the foregoing reasons and those reasons set forth in this Court's prior Memorandum

Opinions of January 29, 2010 and March 26, 2010, IT IS HEREBY ORDERED that all evidence

obtained from Defendant's person and vehicle on April 8, 2008, must be suppressed.